54

| Official Use Only | | |
|---|---|---|
| Case Number | Judge | Magistrate Judge |
| | | |

Case:2:16-cv-10378
Judge: Michelson, Laurie J.
MJ: Morris, Patricia T.
Filed: 02-01-2016 At 11:07 AM
PR KITCHEN V. SNYDER ET AL (NA)

# PRISONER CIVIL RIGHTS COMPLAINT

*This form is for use by state prisoners filing under 42 U.S.C. § 1983 and federal prisoners filing pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).*

## Plaintiff's Information

| Name  Michael A. Kitchen | | Prisoner No.  189265 |
|---|---|---|
| **Place of Confinement**  Bellamy Creek Correctional Facility | | |

| Street 1727 West Bluewater Highway | City  Ionia | State  MI | Zip Code  48846 |
|---|---|---|---|

| Are there additional plaintiffs? ☐ Yes ☒ No |
|---|
| If yes, any additional plaintiffs to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. <u>You must provide names, prisoner numbers and addresses for all plaintiffs.</u> |

## Defendant's Information

| Name  Rick Snyder | Position  Governor |
|---|---|
| **Street/P.O. Box** | City  Lansing | State  MI | Zip Code |

| Are you suing this defendant in his/her: ☐ Personal Capacity   ☐ Official Capacity   ☒ Both Capacities |
|---|
| Are you suing more than one defendant? ☒ Yes   ☐ No   (see Attached) |
| If yes, any additional defendants to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. <u>You must provide their names, positions, current addresses and the capacity (personal, official or both) in which you are suing them.</u> |

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ANDREW KITCHEN,

      Plaintiff,

v.

Case No. _____

Honorable: _____

RICK SNYDER; HEIDI WASHINGTON;
CARMEN PALMER; JOHN OR JANE DOE,
INDIVIDUALLY AND AS PRESIDENT
&/OR CHIEF EXECUTIVE OFFICER OF
CORIZON HEALTH INCORPORATED; JOHN
&/OR JANE DOES, INDIVIDUALLY AND
AS OWNERS &/OR SHAREHOLDERS OF
CORIZON HEALTH INCORPORATED;
CORIZON HEALTH INCORPORATED;
COREY GRAHN; ANTHONY CROLL; TERI
BYRNE; HEIDI SLUSHER; DR. THOMAS
J. DOYLE; REGISTERED NURSE SCHULTZ;
INSPECTOR SIMMONS; R. FRIAS; AND
D. CHRISTIANSEN,
      Defendants.

_____/

## CIVIL RIGHTS ACT COMPLAINT

NOW COMES Plaintiff, Michael A. Kitchen, in a Complaint for damages, declaratory, and injunctive relief against the named Defendants, and hereby states as follows:

### I N T R O D U C T I O N

1. This action for damages, declaratory, and injunctive relief is brought under 42 USC § 1983. Plaintiff is a prisoner confined in the Michigan Department of Corrections currently residing at the Michigan Reformatory in Ionia, Michigan, who is seeking a judgment against the Defendants for violations of constitutional and state law guarantees of which Plaintiff is entitled too. All administrative remedies have been properly exhausted.

2.    Plaintiff seeks medical treatment, as well as a declaration that Michigan's laws, policies, and practices, including MCL 600.2912(d)(1), violate the United States and Michigan Constitutions, insofar as it requires Plaintiff, who is unable because of imprisonment and indigency, to retain or obtain a medical expert, and/or a medical expert's opinion, in order to prepare and file an affidavit of merit to be permitted to file a medical malpractice claim in Michigan's state courts.

3.    For relief, Plaintiff is seeking damages, the Court's immediate intervention to order the restoration and provision of medical treatment, an order striking down as unconstitutional, as applied to Plaintiff, the provision within Michigan's medical malpractice statute that requires the filing of an affidavit of merit, and a judgment restricting the Defendants from placing Plaintiff into solitary confinement for medical quarantine purposes without notice and an opportunity for a hearing, and, if so confined, quarantined under humane conditions, including, but not limited too, with all personal property and access to institutional books and materials consistent with the medical quarantine.

### J U R I S D I C T I O N

4.    Jurisdiction is conferred upon the Court by 28 USC § 1331, 28 USC § 1343(3), 28 USC § 2201, and 28 USC § 1367(a).   Personal and/or general jurisdiction is also conferred on the Court under Michigan long-arm statute and any other laws consistent with holding the out-of-state Defendants liable to Plaintiff as a result of them conducting business in the State of Michigan.

### V E N U E

5.    Venue is proper because the Defendants conduct their business and are largely located in the Eastern District of Michigan, Southern Division.

### P A R T I E S

6.    Plaintiff Michael A. Kitchen is a prisoner and was at all relevant

- 2 -

times herein a resident of Ionia County, State of Michigan, confined within the Michigan Department of Corrections (MDOC) at the Michigan Reformatory (RMI), located at 1342 West Main Street, Ionia, Michigan 48846.

7. Defendant Rick Snyder is the Governor of the State of Michigan and is invested with executive power pursuant to Art. V § 1 of the Michigan Constitution. He is responsible for ensuring compliance with the laws of the State of Michigan. Defendant Snyder resides in Ingham County, Michigan, and is being sued in his individual and official capacities.

8. Defendant Heidi Washington is the Director of the MDOC and is located at its Headquarters in Ingham County, at the Michigan Department of Corrections, P.O. Box 30003, Lansing, Michigan 48909. She is being sued in her individual and official capacities.

9. Defendant Carmen Palmer is the Warden of RMI, and is located at 1342 West Main Street, Ionia, Michigan 48846. She is being sued in her individual and official capacities.

10. Defendant John and/or Jane Doe is the President and/or Chief Executive Officer of Corizon Health Incorporated (Corizon) and a citizen and/or resident of the State of Tennessee, whose business address is believed to be Corizon's corporate headquarters located at 103 Powell Court, Brentwood, TN 37027 and/or 105 Westpark Drive, Suite 200, Brentwood, TN 37027. He or she is being sued in his or her individual and official capacities.

11. Defendants John and/or Jane Does are the Owners and/or Shareholders of Corizon, and, based on information and belief, are citizens, residents, and/or conduct their business in the State of Tennessee at Corizon's Headquarters whose address is believed to be 103 Powell Court, Brentwood, TN 37027 and/or 105 Westpark Drive, Suite 200, Brentwood, TN 37027. They are

- 3 -

being sued in their individual and official capacities.

12. Defendant Corizon is a foreign corporation whose home, principal place of business, and/or corporate headquarters is believed to be located at 103 Powell Court, Brentwood, TN 37027 and/or 105 Westpark Drive, Suite 200, Brentwood, TN 37027. Corizon regularly conducts business in the State of Michigan and/or the MDOC as a result of a contract to provide medical services to Michigan's prisoner population. Corizon is being sued in its individual and official capacities.

13. Defendant Corey Grahn is a Nurse Practitioner employed by Corizon and working at the Health Services Unit (HSU) in RMI located at 1342 West Main Street, Ionia, Michigan 48846. He is being sued in his individual and official capacities.

14. Defendants Anthony Croll, Teri L. Byrne, Heidi Slusher, and Nurse Schultz are employed by Corizon and working in HSU at RMI located at 1342 West Main Street, Ionia, Michigan 48846. They are being sued in their individual and official capacities.

15. Defendant Thomas J. Doyle is an Optometrist and contract employee of Corizon and/or the MDOC retaind to provide optometry services to prisoners within the MDOC at RMI. He can be found at RMI, at 1342 West Main Street, Ionia, Michigan 48846, and he is being sued in his individual and official capacities.

16. Defendant Simmons is an Inspector at RMI located at 1342 West Main Street, Ionia, Michigan 48846, and he is being sued in her individual and official capacties.

17. Defendant D. Christiansen is a Mailroom Clerk at RMI, located at 1342 West Main Street, Ionia, Michigan 48846, and she is being sued in her individual and official capacities.

- 4 -

18. Defendant R. Frias is a Prison Counselor at RMI, located at 1342 West Main Street, Ionia, Michigan 48846, and he is being sued in his individual and official capacities.

## STATEMENT OF FACTS

### COUNT I

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

19. On or about May 21, 2015, Plaintiff's right eye became irritated and turned red as a result. Plaintiff could not get any official to pay attention to the matter until the early morning hours of May 22, 2015, when the condition progressively worsened and Plaintiff awakened with extreme pain on the right side of the face and head.

20. In particular, a rash-like condition had begun to rapidly grow and blister on the right side of Plaintiff's face and head, which resulted in rapid swelling.

21. Plaintiff's right eye also began to swell shut, and Plaintiff began to experience impaired and blurred vision.

22. The rash-like condition began to also ooze greenish-like puss and a clear-like liquid, that periodically dripped down Plaintiff's face.

23. Plaintiff immediately contacted a corrections officer for help, and the officer, in turn, briefly examined Plaintiff and immediately contacted the facility's Control Center to summon medical aid.

24. Plaintiff has a constitutional right to receive adequate medical care, including, but not limited too, prompt response to perceived instances where medical treatment is necessary, adequate screening, testing, and analyzing in order to ensure that the proper medical treatment is administered and given in a timely fashion, and treatment for as long as it will take to

cure the ailment.

25. To this end, Registered Nurse Robert Sheldon and a corrections officer responded to Plaintiff's call and Sheldon examined Plaintiff at cell-side. Sheldon was summoned from an outside correctional facility to come to Plaintiff's aid.

26. Nurse Sheldon stated that the right side of Plaintiff's face, in the temple area and above the right eye, was covered with fluid filled blisters, which is a common sign and symptom of Shingles, and opined that Plaintiff may have a condition most commonly known as Shingles and medically known as Herpes Zoster.

27. Herpes Zoster or Shingles is an infection that is caused by the varicella-zoster virus, which is the same virus that causes chickenpox. After contracting chickenpox, the varicella-zoster virus remains dormant in the body for several years without causing any symptoms. Herpes Zoster occurs when the varicella-zoster virus becomes active again.

28. Once active, the virus travels along a nerve in a person's body to the skin and causes a rash. The condition and rash are very painful and potentially crippling. Left untreated or if treatment is delayed, Shingles can cause serious problems such as drooping eyelids, blindness, brain infection, stroke, nerve damage, twitching, dizziness, loss of taste and hearing, blisters, and trouble moving parts of the body.

29. Studies have shown that Herpes Zoster will affect approximately one out of every three people, and the rash-like symptom typically appears on parts of the body like the back, side, or legs.

30. In rare cases, however, Herpes Zoster can appear on and around a person's face, head, and eyes, and this form of the virus, known as Herpes Zoster Ophthalmicus, is the most serious form of the virus which, based on

- 6 -

information and belief, is estimated to effect very few people.  It can result in blindness and other serious medical complications.

31.   The pain associated with Herpes Zoster is extreme and can become severe, effecting the nerves, preventing sleeping, and may become so severe that epidural medicine will sometimes have to be injected into the spine and used to treat the pain.

32.   There is a simple test that can be administered by a nurse or medical professional to skin scrappings or fluid from the blisters or infected area of a person with shingles which can determine whether the person has Herpes Zoster.

33.   However, in order to cut prisoner health care costs and save money, in addition to a desire to feign ignorance of a prisoner having shingles so as to prevent having to spend the money, which is considered expensive, to treat the ailment, Corizon, its president, chief executive officer (CEO), shareholders, owners, and/or its personnel working in RMI's HSU do not administer the test to prisoners whom are suspected or believed to have Herpes Zoster or Shingles so that they can save costs.

34.   Nurse Sheldon immediately scheduled Plaintiff for an examination at HSU, informing Plaintiff that he was going to contact the manager of HSU and see that Plaintiff was examined immediately.

35.   HSU is staffed by medical personnel hired by and under contract with Corizon, and work at the pleasure and instruction of Corizon, and are required by Corizon to abide by the policies, rules, customs, practices, and regulations that Corizon has established to provide medical care to Michigan's prisoner population or else they face termination.

36.   The Defendants named herein, working in RMI's HSU, were working pursuant to and in accordance with such policies, rules, customs, practices,

- 7 -

and regulations established by Corizon when dealing with Plaintiff as herein described.

37.   Following Nurse Sheldon's examination and the facility's opening of normal business hours, Plaintiff was summoned to HSU.  By this time, Plaintiff was experiencing pain in the right eye and the right side of Plaintiff's face was swollen, the right eyelid was swollen, and there were blisters, bumps, and puss appearing along the right temple and above the right eye and the forehead of Plaintiff.

38.   Once arriving at HSU, Plaintiff was seen by Defendant Slusher, who made only a visual inspection of Plaintiff.

39.   Defendant Slusher then asked Plaintiff questions aimed at confirming that Plaintiff had shingles, including asking whether and when Plaintiff had chickenpox, when the symptoms of the condition occurred, and so forth.

40.   Acting pursuant to and/or in accordance with the policies, rules, regulations, customs, or practices of Corizon, and/or as impliedly authorized, approved and knowingly acquiesced by Corizon's CEO, president, shareholders, and/or owners, in order to cut costs or save money Defendant Slusher did not administer any taste or other analysis to the rash-like symptom on Plaintiff's face in order to identify it, but it was evident from her questions that she suspected the rash to be the result of Shingles.

41.   Defendant Slusher, along with another nurse whose name is unknown, showed Plaintiff pictures from a computer terminal of other persons with Shingles.

42.   Defendant Slusher is a nurse with years of experience, and she has seen perhaps hundreds of or numerous people of all races or ethnicities whom have had shingles.

43.   Due to such experienced, Defendant Slusher recognized Plaintiff's

condition as being that of Shingles.

44.    However, acting pursuant to and/or in accordance with the policies, rules, regulations, customs, or practices of Corizon, and/or as impliedly authorized, approved and knowingly acquiesced by Corizon's CEO, president, shareholders, and/or owners, Defendant Slusher deliberately and intentionally did not administer any tests or other analysis in order to identify Plaintiff's serious condition because, in order to aid Corizon and/or its president, CEO, shareholders, and/or owners as they wanted as heretofore stated, she wanted to feign ignorance, and aid Corizon to feign ignorance, of the condition so that she would not have to treat, or recommend the treatment of, the rare form of the Shingles virus that Plaintiff had because the treatment was expensive, and she wanted to aid Defendant Grahn, Corizon, its president, CEO, shareholders, and/or owners to cut costs to prisoner health care and make money.

45.    Defendant Slusher then summoned Defendant Grahn to take a look at the rash-like symptom on Plaintiff's face and the swelling and injuries resulting from it.

46.    Defendant Grahn never approached Plaintiff, but, in stead, stood approximately five (5) feet away from Plaintiff and conducted a visual inspection of Plaintiff, because he suspected, based on Plaintiff's appearance as heretofore stated, that Plaintiff had Shingles or an equally comparable serious infection and/or contagion.

47.    Defendant Grahn is an experienced nurse who has seen hundreds of or numerous people of all races or ethnicities whom have had Shingles or an equally comparable serious illness.

48.    Although Defendant Grahn saw the puss and blisters breaking out on the right side of Plaintiff's face, causing the area to swell unnaturally, Defendant Grahn, acting pursuant to and/or in accordance with the policies,

- 9 -

rules, regulations, customs, or practices of Corizon, and/or as impliedly
authorized, approved and knowingly acquiesced in by Corizon's CEO, president,
shareholders, and/or owners, deliberately and intentionally did not administer,
or order the administration of, any tests or other analysis in order to
officially indentify the condition, because, acting pursuant to and/or in
accordance with the policies, rules, regulations, customs, or practices of
Corizon, and/or as impliedly authorized, approved and knowingly acquiesced in
by Corizon's CEO, president, shareholders, and/or owners, he wanted to feign
ignorance of the condition, and/or avoid legal liability, so that he would not
have to treat, or recommend the treatment of, the Shingles condition so that he
could aid Corizon, its president, CEO, shareholders, and/or owners cut costs in
prisoner health care and make or save money.

49.   Acting pursuant to and/or in accordance with the policies, rules,
regulations, customs, or practices of Corizon, and/or as impliedly authorized,
approved and knowingly acquiesced in by Corizon's CEO, president, shareholders,
and/or owners, Defendant Grahn ordered Defendant Slusher to "stain" Plaintiff's
right eye in stead of treating Plaintiff's condition.

50.   Defendant Slusher stained Plaintiff's eye and issued Plaintiff some
eye drops, and ordered Plaintiff to return to his assigned quarters.

51.   Acting pursuant to and/or in accordance with the policies, rules,
regulations, customs, or practices of Corizon, and/or as impliedly authorized,
approved and knowingly acquiesced in by Corizon's CEO, president, shareholders,
and/or owners, Defendant Slusher deliberately and intentionally made no attempt
to identify the rash on Plaintiff's face or its cause before instructing
Plaintiff to return to his assigned unit, and did so in order to feign
ignorance, and/or avoid legal liability, of Plaintiff's condition and avoid
having to treat, or recommend the treatment of, the virus so that she could aid

Defendant Grahn help Defendants Corizon, its president, CEO, shareholders, and/or owners maximize cost savings at the expense of Plaintiff's health and safety.

52.   Throughout that day, Plaintiff's condition, as observed by corrections officers, considerably worsened, including, but not limited too, increased swelling of the face, the rash and blisters spreading on the right side of Plaintiff's face to now include more of the area around the temple, the top of the right eyebrow, the forehead, between the eyebrows, and on and under the right eyelid.

53.   By May 23, 2015, Plaintiff's condition became nearly debilitating, and now the right side of Plaintiff's face had considerably swollen and the right eye had nearly swollen shut.  The pain that Plaintiff was feeling at this time was "blinding", and even kept Plaintiff from sleeping.

54.   During this time, Plaintiff's assigned "floor officer" made repeated checks on Plaintiff, remaining in the area and in Plaintiff's face until he received a verbal response.

55.   Concerned that Plaintiff's condition was becoming even worse or critical, the floor officer contacted his supervisor, a sergeant.

56.   The sergeant made a visual inspection of Plaintiff and immediately paid a personal visit to HSU in order to urge a nurse to once again examine Plaintiff.

57.  At the behest of the sergeant, Defendant Croll summoned Plaintiff to HSU at or around 1030 hours on the morning of May 23rd.  At this time, he was angry and irritated.

58.   Plaintiff's condition HAd considerably worsened at this time, and because of this Plaintiff requested to go to the emergency room, and, in support, showed Defendant Croll his injuries, which included, but not limited

- 11 -

too, a swollen face and eye, the blisters and puss forming extensively on the right side of the face, and Plaintiff also informed Defendant Croll of the extreme pain being experienced which was now causing nausea and dizziness.

59. Without explanation and acting pursuant to and in accordance with the policies, rules, regulation, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, Defendant Croll denied Plaintiff's access to an emergency room for treatment in order to avoid the cost of hospitalization so as to maximize cost savings at the expense of Plaintiff's health and safety.

60. As evidenced by the findings of juries in other jurisdictions following trials against Defendants Corizon, its agents, officials, and/or employees, and as stated in a declaration from Charles Pugh, who was a former Corizon site medical director in the State of Georgia, prior cases nationwide have shown that efforts were made by Corizon medical personnel, acting pursuant to and in accordance with the policies, rules, regulation, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, to avoid or delay the transfer of prisoners to a hospital to save money or maximize cost savings for Defendants Corizon, its president, CEO, shareholders, and/or owners at the expense of patient health and safety.

61. Defendant Croll, acting pursuant to and in accordance with the policies, rules, regulation, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, deliberately and intentionally made no attempt to administer any type of tests or other analysis to the rash and blisters appearing on Plaintiff's face in order to determine their cause or

origin, or to determine whether Plaintiff had the varicella-zoster or shingles virus, so that he could feign ignorance, and/or avoid legal liability, of Plaintiff's condition, and not have to treat, or recommend the treatment of, the virus so that he could aid Defendant Grahn and Defendants Corizon, its president, CEO, shareholders, and/or owners maximize cost savings at the expense of Plaintiff's health and safety.

62.   Defendant Croll is a nurse with considerable experience, training, and knowledge, who has seen hundreds of or numerous people of all races or ethnicities whom have had shingles, and knew, based on what he was seeing of Plaintiff's serious medical condition, that Plaintiff was infected with Shingles.

63.   Nevertheless, Defendant Croll, acting pursuant to and in accordance with the policies, rules, regulation, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, deliberately and intentionally failed and/or refused to treat Plaintiff for, or permit and/or delayed Plaintiff's access to a hospital or emergency room for the treatment of, the Shingles virus in order to maximize cost savings at the expense of Plaintiff's health and safety.

64.   Defendant Croll then ordered Plaintiff to return to his assigned cell, still refusing to take any steps to examine, test, analyze, treat, or identify the rash on Plaintiff's face or its cause, in spite of the obvious injuries and deformities to Plaintiff's face, so that he would not have to treat, or recommend the treatment of, Plaintiff's condition so as to aid Defendants Corizon, its president, CEO, shareholders, and/or owners maximize cost savings at the expense of Plaintiff's health and safety.

65.   Plaintiff did return to his assigned quarters, and throughout the

- 13 -

remainder of that day Plaintiff suffered extreme pain and his condition steadily worsened.

66. On May 24, 2015, corrections officers advised Plaintiff to talk to a lieutenant, and Plaintiff was released from his assigned quarters to do so. Plaintiff located a lieutenant in the facility's Dining Hall that evening, and informed him about the matter which included medical personnels' refusal to afford Plaintiff any type of treatment.

67. The lieutenant examined Plaintiff and immediately contacted HSU, and urged them to, once again, examine Plaintiff. By this time, Plaintiff was in unimaginable pain, and the right side of Plaintiff's face was swollen to twice its size, the right eye was swollen completely shut, blisters and lesions covered Plaintiff's right temple area, above the right eye, on the right eyelid, inside the corner of the right eye, between the eyebrows, and under the right eyelid, and skin began to peel off of Plaintiff's face and the blisters were oozing blood, puss, and a clear-like liquid.

68. Furthermore, Plaintiff had lost all vision in the right eye, and the damage also began to effect the left eye to such an extent that Plaintiff's vision in the left eye began failing as well.

69. At the urging of the lieutenant, Plaintiff was summoned to HSU once again and met with Defendant Croll, and Defendant Croll finally agreed to make arrangements for Plaintiff to be transported to an emergency room and receive treatment.

70. Thereafter, Plaintiff was transported to the local emergency room at Sparrow Ionia Hospital, and immediately examined by two doctors. After being examined, both made a determination that Plaintiff had Shingles or Herpes Zoster virus.

71. Plaintiff was immediately injected on two occasions with morphine,

- 14 -

and immediately transported by ambulance to the Ingham Regional Medical Center-McLaren Greater Lansing (Ingham Medical Center) in Lansing, Michigan.

72.   Upon arrival, Plaintiff was admitted into the Ingham Medical Center, quarantined under the Center's infectious control policy, examined immediately by two additional physicians, attached to intravenous tubes, and started on medication to treat the Shingles virus and alleviate the extreme pain.

73.   Plaintiff remained quarantined in the Ingham Medical Center receiving treatment for five (5) days, and on the evening of the fifth day (May 28th) was no longer considered infectious and so was discharged from the Center and returned to RMI.

74.   Upon being discharged, however, the physician staff at the Ingham Medical Center prescribed and ordered that Plaintiff receive and remain on certain types of medication intended to lessen the extreme pain that Plaintiff continued to experience, complete the treatment of the varicella-zoster virus and return it to a state of dormancy, as well as medication designed to aid in the restoration of Plaintiff's vision or eyesight.

75.   This medication included Acyclovir (prescribed to be taken five times a day for seven days); Bacitracin Ointment (prescribed to be applied to lesions on Plaintiff's face, head, and temple area every twelve hours); Gabapentin Capsule (prescribed to be taken three times per day until further notice); Hydrocodone-acetamin tablet (prescribed to be taken every four hours); Moxifloxacin Eye Drops (prescribed to be taken three times per day); Prednisolone Eye Drops (prescribed to be applied every six hours until swelling to the eye went down); and Peridex Mouthwash (prescribed to be taken two times per day).

76.   By this time, Plaintiff continued to experience extreme pain, impaired vision, and swollen eye and face, but otherwise the physician staff at

- 15 -

the Ingham Medical Center managed to get control of the virus and rendered it non-infectious and trying to return it to a state of dormancy.

77.   As a direct and proximate result of the Defendants' failure and/or refusal to permit Plaintiff's access to medical treatment, and/or delaying access to that medical treatment, including, but not limited too, timely transferring Plaintiff to a hospital to receive that treatment and/or access to treatment at the facility level so that access to a hospital to receive treatment would not be needed, Plaintiff's serious medical condition worsened and/or became exacerbated to such a degree that the right side of Plaintiff's face swelled to twice its size, Plaintiff's eye swelled completely shut and vision was completely lost in the right eye (not from swelling shut but from the virus) and vision become impaired in the left eye, lesions and blisters appeared around the right temple area, the right eyelid, on the forehead, and between the eyebrows, and Plaintiff's skin peeled off of areas around the temple area, eye, above the right eye, and forehead, as well as became discolored.

76.   As a direct and proximate result of the Defendants' failure and/or refusal to permit Plaintiff's access to medical treatment, and/or delaying access to that medical treatment, including, but not limited too, timely transferring Plaintiff to a hospital to receive that treatment and/or access to treatment at the facility level so that access to a hospital to receive treatment would not be needed, Plaintiff is suffering from continued and constant pain in the right eye, right temple, and right head area, numbness in areas around the right temple and head, as well as suffering from migraine-type headaches, failing eyesight and vision complications such as photophobia.

- 16 -

## COUNT II

### DELIBERATE INDIFFERENCE TO SERIOUS
### MEDICAL NEEDS, DUE PROCESS VIOLATION,
### CRUEL AND/OR UNUSUAL PUNISHMENT, RIGHT TO
### BE INFORMED, FALSE IMPRISONMENT, & ABUSE OF PROCESS

79.  Upon return to RMI, Plaintiff was received into the facility like any other prisoner routinely transferring into RMI, with no special precautions or procedures being employed to separate or isolate Plaintiff from either staff or other prisoners.

80.  Plaintiff was received at RMI in such a fashion because upon discharge from the Ingham Medical Center, prison officials were not told, nor did medical personnel at the Ingham Medical Center trasmit a message, records, or other communication to prison officials informing them, that Plaintiff continued to be infectious or having a communicable disease or other impairment that was contagious and therefore a risk to other prisoners or staff.

81.  As such, upon arrival at RMI following discharge, Plaintiff mingled amongst the general prison population's staff and prisoners like any other prisoner or person, and over an hour later was summoned to RMI's HSU by Defendant Byrne.

82.  Plaintiff arrived at RMI with records and discharge instructions pertaining to Plaintiff's continued care and information on his condition, and documents completed by the medical staff at the Ingham Medical Center that included instructions on Plaintiff's care, prescriptions for medications, and an information packet pertaining to Plaintiff's condition.

83.  The medical staff at the Ingham Medical Center provided two copies of these records and documents to the officers whom were transporting Plaintiff, and Plaintiff was told that one copy of the records and documents were to be given to Plaintiff and the other copy was to be provided to facility staff at RMI.  However, Plaintiff's copy of the records and documents were given to the

- 17 -

officers transporting Plaintiff, because Plaintiff, as a prisoner, was not permitted to possess any property or papers during transportation to RMI in accordance with the prison's rules.

84.   Upon arrival to RMI's HSU, Plaintiff's copy of the aforementioned records, instructions, and documents was given to Defendant Byrne by one of the transport officers, and at this time Defendant Byrne, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, deliberately and intentionally cancelled, or stated to Plaintiff an intent to cancel, all of the prescriptions and medications ordered for Plaintiff's care and recovery by the physician staff at the Ingham Medical Center in order to aid Corizon, its president, CEO, shareholders, and/or owners maximize cost savings at the expense of Plaintiff's health and safety.

85.   Defendant Byrne simply informed Plaintiff that HSU was not going to fill the prescriptions albeit she knew that Plaintiff needed the medication for his care and in order to aid in his recovery from shingles and the damage done to his body as a result of the virus.

86.   Acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as by Defendants Washington, Palmer, and Grahn, Defendant Byrne then ordered Plaintiff's quarantine or isolation in RMI's solitary confinement unit. Defendant Byrne gave no explanation for the quarantine other than informing Plaintiff that she was told to order Plaintiff's quarantine.

87.   Acting pursuant to and in accordance with the policies, rules,

- 18 -

regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as Defendants Washington, Palmer, and Grahn, including, but not necessarily limited too, as a result of the failure on behalf of Defendants Washington and Palmer to train and instruct staff, Defendant Byrne did not provide Plaintiff with a written or verbal explanation for the quarantine, nor was Plaintiff given any documentation or other notice enabling a challenge to or hearing on the quarantine.

88. At the time that the quarantine was ordered, Plaintiff was not contagious nor was Plaintiff infected with an "airborne" communicable disease that would have required isolation or quarantine, and Plaintiff was accepting medical services, testing, and treatment for the Shingles virus.

89. Acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, Defendant Byrne then confiscated and refused to provide Plaintiff with a copy of the prescriptions, notices, information packet, and discharge instructions or papers that the medical staff at the Ingham Medical Center provided to Plaintiff upon discharge from that facility.

90. Plaintiff explained to Defendant Byrne that his copy of those documents and records were with the copies of the records and documents in her possession and of which was given to her by one of the transport officers, but Defendant Byrne responded that Plaintiff would need to formally request and pay for the copies of the aforesaid records and documents from HSU.

91. Acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO,

- 19 -

shareholders, and/or owners, as well as Defendants Washington and Palmer, in addition to as specifically ordered by Defendants Grahn and Byrne, prison officials seized, detained, and transported Plaintiff to a segregation cell in RMI's solitary confinement unit and Plaintiff was confined in a cell for quarantine purposes where prisoners normally serve punitive segregation sentences.

92.   Neither Defendants Washington, Palmer, their predecessors, nor any other departmental and/or medical staff of the MDOC, have ever developed any policies, rules, or regulations which governs the placement of prisoners in isolation or quarantine, or trained MDOC staff in such instances, other than in cases where prisoners have declined or refused required medical screening, testing, or treatment for communicable diseases.

93.   This means that, with exception to cases where a prisoner has declined medical screening, testing, or treatment for a communicable disease, Defendants Washington, Palmer, or their predecessors have never required the training or instruction of departmental and medical staff as to how to handle or deal with cases of a medical quarantine against a prisoner in instances or circumstances similar to Plaintiff's, and, in particular, in cases where a prisoner has not declined or refused required medical screening, testing, or treatment for communicable diseases and of whom is suspected or may have a communicable disease or infected with some other type of virus.

94.   Because or as a result of this lack of training, instruction, and the creation of policies, rules, and regulations in such cases, Defendants Washington, Palmer, and their predecessors have permitted, approved of, and knowingly acquiesced in medical staff throughout the MDOC devising methods of placing prisoners in isolation or medical quarantine on a case-by case basis, without any instruction or guidance on their discretion, and in whichever

- 20 -

manner, whatever way, and whenever they see fit, and without providing prisoners with any written notification or verbal explanation for, or providing such prisoners with a hearing in front of a hearings officer in connection with, the order directing what has been referred to as a medical isolation or quarantine.

95. Furthermore, Defendant Washington and her predecessors have never trained or instructed departmental or medical staff of the MDOC, nor created any policies, rules, or regulations, designating a person or single authority to make the decision to issue an order to medically isolate or quarantine a prisoner in cases similar to Plaintiff or in cases where a prisoner has not declined or refused medical screening, testing, or treatment for a communicable disease, serious condition, or virus, and of whom is suspected or may have a communicable disease or virus, and because of that have permitted, approved of, or knowingly acquiesced in any person amongst a facility's medical staff in making the decision to isolate or quarantine a prisoner, even those whom are unqualified and/or with little or poor medical training and/or education.

96. Defendants Washington and Palmer have also failed to train, instruct, or create any policies, rules, or regulations guiding the discretion of departmental and medical staff on the place where prisoners are to be isolated or quarantined for medical purposes, or the type of property that such prisoners are to have while medically isolated or quarantined and how such prisoners are to be treated in such state, and because of that have permitted, approved of, or knowingly acquiesced in departmental and medical staff, even those whom are unqualified and/or with little or poor medical training and/or education, isolating or quarantining prisoners in stripped down cells and with no property and treated like prisoners normally confined

- 21 -

in a segregation cell serving detention or punitive segregation sanctions, albeit such prisoners are not quarantined for disciplinary reasons.

97. The punitive segregation cell that Plaintiff was ordered to be confined in pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as by Defendants Washington, Palmer, and Grahn, was located on the same "wing" as other segregation prisoners serving detention or punitive segregation sanctions, had an "open cell-front" with cell bars like the other segregation cells, but was situated in a dark corner of the unit and had no windows, ventilation, or sunlight, and was infested with mice.

98. Defendants Washington, Palmer, and Grahn, with Grahn acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, are aware, and have been aware for quite sometime, of these segregation cells within the segregation or solitary confinement units that have no windows, proper ventilation, or sunlight, and that are infested with mice, but have knowingly approved and ordered the use of these cells to house prisoners on medical quarantine status.

99. Nevertheless, Defendants Washington, Palmer, Grahn, Corizon, and Corizon's president, CEO, shareholders, and/or owners, have never taken any steps in which to provide windows and proper ventilation to the cells used for medical quarantine purposes, or to exterminate the vermin infestation that they are aware the cells are plagued with.

100. While in the segregation or solitary confinement unit, Plaintiff

was permitted to mingle with the other segregation prisoners, including showering next to and at the same time as these prisoners, as well as permitted to reside next to and associate with them. In other words, while Plaintiff was told that he was being placed in solitary confinement or segregation for medical quarantine purposes, Plaintiff was actually never isolated or quarantined.

101.   However, Plaintiff was not permitted to have any property while isolated or quarantined, including, but not limited too, being deprived of a cup in which to drink water from, basic hygiene items, legal papers, and reading materials pursuant to the policies, rules, regulations, customs, and practices of, or as impliedly authorized, approved, and knowingly acquiesced in by, Defendants Washington, Palmer, and Grahn.

102.   Further stating, during the night of May 28, 2015, following Plaintiff's confinement in the punitive segregation or solitary confinement cell, Plaintiff began experiencing extreme pain and was scheduled to take the pain, antiviral, and other medication designed to alleviate the pain being experienced, to treat the shingles virus, and help restore Plaintiff's vision or eyesight. This medication was prescribed by the physician staff at the Ingham Medical Center.

103.   Plaintiff's floor officer in the segregation or solitary confinement unit contacted HSU and informed them that Plaintiff required the medication, and Defendant Schultz took the call.

104.   However, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, Defendant Schultz flatly refused to issue Plaintiff any medication, not even medication for the extreme pain that he was

- 23 -

aware that Plaintiff was suffering from.

105.   As a direct and proximate result of Defendant Schultz's refusal to respond to Plaintiff's call for medical assistance, Plaintiff suffered extreme pain for the remainder of that night and into the following day and was deprived of medication to treat the shingles virus, and Plaintiff's serious medical condition worsened or was exacerbated.

106.   As a direct and proximate result of Defendant Byrne's refusal to provide or furnish Plaintiff with the copies of the prescriptions, records, discharge instructions and other documents that was intended to be given to Plaintiff by the medical staff at the Ingham Medical Center, Plaintiff was forced to purchase the said records, documents, and other papers after a prolong delay.

107.   Further stating, as a further direct and proximate result of Defendant Byrne's order to confine Plaintiff to solitary confinement without explanation, Plaintiff became depressed, suffered mental anguish and emotional distress as a result of being confined in a stripped down dark, windowless, and rodent infested cell languishing for over 24 hours with literally few people to talk too and nothing to do but stare at the walls.

## COUNT III

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS, RETALIATION, DUE PROCESS VIOLATION, RIGHT TO BE INFORMED, FALSE IMPRISONMENT, ABUSE OF PROCESS & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.   On May 29, 2015, Plaintiff was summoned to HSU to meet with Defendant Grahn, and during this time Defendant Grahn, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as

Defendants Washington and Palmer, indicated that it was his decision to release Plaintiff from the punitive segregation cell and from quarantine status, and permit Plaintiff to return to the general prison population.

109.   After giving Plaintiff a brief visual examination, Defendant Grahn agreed to release Plaintiff from the punitive segregation cell and lift the quarantine status.

110.   However, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as Defendants Washington and Palmer, Defendant Grahn stated that he would permit Plaintiff to remain in the general prison population so long as Plaintiff agreed to go on "meals-in" status.

111.   "Meals-in" status includes a prisoner being confined in a cell in the general prison population along with his personal property and permitted to shower and mingle to a limited extent with other prisoners, but not permitted to attend the facility's Dining Hall.  In stead, Plaintiff would be required to eat his breakfast, lunch, and supper meals in his assigned quarters.

112.   Acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, Defendant Grahn then provided Plaintiff with a "Medical Detail" requiring Plaintiff to eat his meals in his assigned quarters.

113.   Acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO,

- 25 -

shareholders, and/or owners with the intent to maximize cost savings at the expense of Plaintiff's health and safety, Defendant Grahn then cancelled and stated that he was not going to fill the prescription medication that was ordered or prescribed for Plaintiff by the physician staff at the Ingham Medical Center, even though he knew that Plaintiff needed the medication for his care and in order to aid in his recovery from Shingles and the damage done to Plaintiff's body as a result of the virus. The only medication that was not cancelled by Defendant Grahn was the prescription for the Acyclovir (Zovirax) tablets.

114.   Plaintiff then expressed to Defendant Grahn an intent to file complaints and challenge the decision not to fill the prescriptions.

115.   Defendant Grahn seemed irritated and angry at Plaintiff's express intent to file complaints challenging the cancellation of the prescriptions, and so concluded the meeting.

116.   Plaintiff then returned to the facility's segregation or solitary confinement unit to await release from the quarantine status as Defendant Grahn had stated at the meeting, but later discovered that after leaving the meeting Defendant Grahn, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, and knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, as well as Defendants Washington and Palmer, Defendant Grahn refused to lift the quarantine status and release Plaintiff from the segregation or solitary confinement unit.

117.   According to the prison guards managing the segregation or solitary confinement unit where Plaintiff was confined, Defendant Grahn suddenly "changed his mind" and refused to release Plaintiff from the quarantine status and from the segregation or solitary confinement unit.

118. At the time that the quarantine status was ordered to be re-
imposed by Defendant Grahn, Plaintiff was not contagious nor was Plaintiff
infected with an "airborne" communicable disease that would have required
isolation or quarantine, nor did Plaintiff suddenly come down with any other
infection, virus, or illness, and Plaintiff was accepting medical services,
testing, and treatment for the Shingles virus.

119. Acting pursuant to and in accordance with the policies, rules,
regulations, customs, and practices of, and/or as impliedly authorized,
approved, and knowingly acquiesced in by, Corizon, its president, CEO,
shareholders, and/or owners, as well as Defendants Washington and Palmer,
Defendant Grahn refused to lift the quarantine status that he imposed against
Plaintiff, and release Plaintiff from solitary confinement, because he
intended to deliberately retaliate against Plaintiff for expressing an intent
and preparing to file complaints and challenge, and with the hopes of
suppressing and intimidating Plaintiff from challenging, the decision to
cancel the medications prescribed by the physician staff at the Ingham Medical
Center.

120. Acting pursuant to and in accordance with the policies, rules,
regulations, customs, and practices of, and/or as impliedly authorized,
approved, and knowingly acquiesced in by, Corizon, its president, CEO,
shareholders, and/or owners, as well as Defendants Washington and Palmer as a
result of their failure to train and instruct staff by the promulgation of
policies, rules, and regulations, Defendant Grahn did not provide Plaintiff
with any verbal or written explanation as to the reasons for the continued
confinement in segregation for medical quarantine purposes, nor provided
Plaintiff with the means or opportunity to challenge at an administrative or
prison hearing the decision to continue confining Plaintiff in solitary

confinement.

121.    Plaintiff remained confined in the dark punitive segregation or solitary confinement cell, with no windows, ventilation, or sunlight, and infested with mice, until the evening of Monday, June 01, 2015.  During this time, Plaintiff still was not provided with any property other than having a blanket and two sheets.

122.    During Plaintiff's continued confinement in the punitive segregation or solitary confinement unit, Plaintiff continued to mingle and associate with other segregation prisoners, including, but not limited too, showering with or next to them and residing in a cell with an "open cell-front" (meaning a cell with "cell bars") like the other cells in that unit.

123.    As a direct and proximate result of the Defendants' cancellation or refusal to fill the prescriptions ordered for Plaintiff's care and health by the physician staff at the Ingham Medical Center, the chunks of skin that peeled off of the right side of Plaintiff's face did not heal properly, and took a prolong period to heal in the improper manner in which it did, and left permanent scars and skin discoloration in the area on Plaintiff's skin where the aforementioned injuries caused by the shingles virus was located, Plaintiff now suffers from permanent impairment to his vision, including, but not limited too, photophobia and the inability to see clearly and properly, especially out of the right eye, continued pain and/or nerve damage, as well as numbness, in areas on the right side of the head, temple area, right eye, and areas on the right side of the face, and Plaintiff is at an increased risk of once again contracting shingles.

124.    Further stating, as a direct and proximate result of confining Plaintiff in solitary confinement, Plaintiff was confined in a stripped down, dark, and windowless cell for days without reading materials, leisure time

activities, and hygiene and other basic necessities, depressed, afflicted with mental anguish and emotional distress that affected not just Plaintiff's appetite, and resulted in Plaintiff not being able to eat while confined in solitary, but also the rate at which Plaintiff recovered from his injuries.

## COUNT IV

### DELIBERATE INDIFFERENCE OF MEDICAL CARE; FAILURE TO ENSURE PROVISION OF PRESCRIBED MEDICATION

125. On June 2, 2015, Plaintiff met with Defendant Doyle for a cornea evaluation.

126. Defendant Doyle is a contract employee of Defendant Corizon and/or the MDOC, hired to provide optometry services to prisoners, and he examined Plaintiff pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, or as knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners.

127. At the conclusion of his examination, Defendant Doyle discovered that Plaintiff had an ulcer on the cornea of the right eye, as a direct and proximate result of the Herpes Zoster virus and the refusal or delay in treatment of that virus. Defendant Doyle also discovered that Plaintiff's vision was threatened and that the condition should and/or will be treated with medication in order to aid in the restoration of Plaintiff's vision.

128. However, pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, or as knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners so as to maximize cost savings at the expense of Plaintiff's health and safety, Plaintiff was not given any medication to aid in the treatment of his condition.

129.    In the weeks that followed, Plaintiff continued to suffer complications with his vision, including but not limited too, lessen visibility, pain in the eye, swelling around the eye area, and what seemed to be "black outs" of visibility where Plaintiff was not able to see or visualize anything.

130.    Plaintiff repeatedly requested medical care from Defendant Doyle and the Corizon employees named as Defendants herein employed as healthcare workers at RMI's HSU, but, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, or as knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, said Defendants refused to provide Plaintiff with any type of treatment for the eye or vision complications and surrounding problems so as to maximize cost savings at the expense of Plaintiff's health and safety for Defendants Corizon, its president, CEO, shareholders and/or owners.

131.    In stead, acting pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, or as knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners, Registered Nurses and Corizon employees Kaylene M. Graham, Josh Langdon, and other nurses or employees, responded to Plaintiff's requests for medical aid denying treatment for the continuing pain and visibility complications that Plaintiff was experiencing.

132.    On November 3, 2015, Plaintiff again met with Defendant Doyle for a cornea examination, and, once again, Defendant Doyle examined Plaintiff pursuant to and in accordance with the policies, rules, regulations, customs, and practices of, and/or as impliedly authorized, approved, or as knowingly acquiesced in by, Corizon, its president, CEO, shareholders, and/or owners.

- 30 -

133. During the examination, Defendant Doyle stated that Plaintiff was suppose to have received medication to aid in the recovery or restoration of his vision, and, in fact, stated that he had prescribed the medication in June 2015.

134. During this time, Plaintiff explained to Defendant Doyle that the medication prescribed was not provided despite the filing of grievances, complaints, and medical request forms.

135. Defendant Doyle did not ensure that Plaintiff received the prescribed medication, even though as a result of Plaintiff's numerous written complaints and requests for medical care to RMI's HSU he reasonably knew that Plaintiff was not receiving his prescribed medication.

136. Defendant Doyle also knew that the lack of treatment posed a substantial risk of serious harm to Plaintiff, but yet he continued to take no steps to ensure that Plaintiff received the medication that he prescribed in order to aid in the recovery of Plaintiff's vision.

137. At the end of the aforesaid examination occurring on November 3rd, Defendant Doyle determined that Plaintiff continued to suffer from an ulcer on the cornea and/or suffered from herpetic keratitis, and that there was no improvement to Plaintiff's visibility or condition from the last time he and Plaintiff met.

138. Defendant Doyle then finally prescribed eye drop medication for Plaintiff called Trifluridine Ophthalmic Solution 1%, which is a sterile ophthalmic solution containing 1% trifluridine in an acqueous solution with acetic acid and sodium acetate (buffers), sodium chloride, and thimerosal (which is said to be added as a preservative). It is used to treat cornea ulcers and/or herpetic keratitis.

139. However, as a result of the delay in providing this medication to

- 31 -

Plaintiff, Plaintiff's vision did not improve, the ulcer that formed on Plaintiff's cornea did not dissipate, Plaintiff experienced and continues to experience pain in the eye and the surrounding region, and Plaintiff suffered from increasing loss of clear vision.

## COUNT V

### "MONELL" SUPERVISOR LIABILITY CLAIMS:
### CORIZON, ITS PRESIDENT, CEO, SHAREHOLDERS, AND/OR OWNERS

140.   In or about early 2011, Valitas Health Services, Incorporated (VHS), merged with or acquired America Services Group, Incorporated (ASG), and brought together two leading companies in the correctional healthcare field, being Prison Health Services, Incorporated (PHS), owned by ASG, and Correctional Medical Services, Incorporated (CMS), which was owned by VHS. In June of 2011, PHS was renamed Corizon Health, Incorporated, one of the named Defendants herein.

141.   Defendants Corizon, president, CEO, shareholders, and/or owners have been hired by the State of Michigan and/or the MDOC and have signed a contract to provide medical care services for Michigan's prisoner population, and that also includes providing medical care to Plaintiff.

142.   The MDOC's contract with Defendants Corizon, its president, CEO, shareholders, and/or owners is reported as being a risk sharing contract under which the MDOC pays the Defendants a per-prisoner, per-month (PPPM) rate that changes at various thresholds of prisoner population (see, State of Michigan Dept. of Mgt. and Budget Contract No. 07169200147 at Section 1.061, available at http://www.michigan.gov/documents/buymichiganfirst/9200147_266670_7.pdf.). According to the contract, the MDOC is responsible for various costs until the total cost reaches a "risk share target", at which point the MDOC and Corizon began to share costs. However, when the total costs reach the risk share

maximum cap, Corizon must absorb any overage (Id., at §§ 1.061 and pp 5, 21, 26, 98.). The actual PPPM amounts decrease for every 1,000 prisoners confined in the MDOC, and have been revised throughout the life of the contract.

143.   Although Defendant Corizon is a private entity and its Defendant president, CEO, shareholders, and/or owners are private individuals, by accepting the contract to provide Michigan's prisoner population with medical services they are performing, or responsible for performing, a function traditionally the exclusive prerogative of the government.

144.   Prior to the merger between CMS and PHS, and/or the acquisition of ASG by VHS, CMS and PHS reputedly had a long history of providing inadequate medical care to prisoners that has resulted in not just the serious injury and death of hundreds of prisoners throughout the United States, but have also resulted in CMS and PHS having to pay hundreds of thousands, or even millions, of dollars in damages to the victims or their families in these inadequate medical care claims.

145.   Juries all across the United States, government officials, and news reports have found that CMS and PHS have intentionally engaged in practices intending to make profits at the expense of inmate health and safety rather than actually providing adequate medical care to prisoner populations throughout the United States as they had been contracted to do.

146.   As a direct and proximate result of these improper practices to make money or profits rather than provide adequate medical care to prisoners throughout the United States, many state governments have cancelled their contracts with CMS and/or PHS, and have elected for state taxpayers to provide basic and adequate medical care to prisoners or hire another company to take on that responsibility.

147.   In fact, in the late 1990s or early 2000s, the State of Michigan

- 33 -

and/or MDOC hired and entered into a contract with CMS to provide medical services to Michigan's prisoner population, but in the year of 2011 Michigan and/or the MDOC reputedly fired CMS after an independent review reputedly found that CMS was engaging in a systematic failure to provide adequate and proper medical care to Michigan's prisoner population.

148. The president, CEO, shareholders, and/or owners of VHS, ASG, PHS, and CMS were acutely aware of not just the hundreds of thousands of dollars that were being paid by their company as a result of court judgments and/or settlements involving inadequate medical care claims, but were also aware of the thousands of reports of serious physical injuries and deaths that were caused as a result of the inadequate medical care being provided to prisoners by those working for their companies acting in accordance with and pursuant to, as juries all across the United States have found, the policies, rules, regulations, customs, and practices of PHS and CMS.

149. With this knowledge in mind, Defendant Corizon (then known as PHS) and its Defendant president, CEO, shareholders, and/or owners entered into an agreement with ASG, VHS, and/or CMS on the pretext of forming a company or corporation to provide medical services to thousands of prisoners throughout the United States, which also included providing medical services to the prisoner population here in Michigan.

150. Defendant Corizon is functionally the same as its shareholders, president, CEO, and/or owners, the Defendants named herein, in that, in most respects, these said Defendnats exercise complete control over Defendant Corizon so that Defendant Corizon has no mind of its own, and such control has resulted in Defendant Corizon, at the behest of the other Defendants named herein, to wit: Defendant Corizon's president, CEO, shareholders, and/or owners; entering into a contract with the State of Michigan on the pretext of

- 34 -

agreeing to provide medical services or care to Michigan's prisoner population, but in reality was intending to make money or engage in unreasonable profit revenues by providing substandard and inadequate medical care to Michigan's prisoner population.

151. Defendants president, CEO, shareholders, and/or owners of Defendant Corizon, as well as Defendant Corizon itself, accomplishes its task of engaging in unreasonable profit revenues or making money, on the pretext of providing medical care to prisoners, by implementing widespread and nationwide policies, rules, regulations, customs, and/or practices to save money by discouraging its staff from referring inmates with complaints of serious medical conditions to its physicians and outside medical practioners or facilities for examination and/or treatment and discouraging its staff from requesting expensive diagnostic tests and procedures, in addition, but not necessarily limited, to maintaining policies and practices of delaying and/or denying testing and treatment for prisoners with Shingles or suspected of having Shingles, and injuries or complications that prisoners inherit after contracting Shingles.

152. In fact, as evidenced by declarations of former employees of Defendant Corizon, and, in particular, Corizon site medical director Charles Pugh, Defendant Corizon's handling of other cases involving prisoners nationwide show that efforts were made to avoid transferring prisoners to a hospital while the prisoner was in the care of Corizon, in addition to constant pressure being applied on Corizon personnel from superiors in Corizon to minimize emergency room visits to save money and constant monitoring by those superiors of hospitalizations of prisoners.

153. Defendant Corizon, at the behest or as impliedly authorized, approved, or knowingly acquiesced in by the other Defendants named herein, to wit: Defendant Corizon's president, CEO, shareholders, and/or owners; have

- 35 -

implemented policies, rules, regulations, customs, and practices to forgo expensive examinations and treatments for prisoners if the costs for such examinations and treatments either exceeds the amount of money that Defendant Corizon receives from the MDOC for each prisoner for each month or if the total medical care costs for all prisoners in a given month exceeds the "risk share maximum cap" as agreed upon in its contract with the MDOC, which includes, but is not necessarily limited too, the costs for examinations and treatments for the type of the very rare Herpes Zoster or Shingles Opthalmicus virus that Plaintiff was infected with.

154. Plaintiff incorporates herein by reference paragraphs #19-78, 84-91, 97-98, and 104-139 of this Complaint as allegations against Defendants Corizon, its president, CEO, shareholders, and/or owners in this regard. These said Defendants encouraged its staff to deliberately delay and/or deny treatment to Plaintiff as well as the other actions noted therein.

155. The policy, rule, regulation, custom, or practice of Defendants Corizon, its president, CEO, shareholders, and/or owners to delay or deny to prisoners what is perceived to be expensive medical treatment, or delay or deny to prisoners medical treatment if the costs of such treatment either exceeds the amount of money that it receives from the MDOC for each prisoner for each month or if the total medical care costs for all prisoners in a given month exceeds the "risk share maximum cap" as agreed upon in its contract with the MDOC, including, but not limited too, denying or delaying sending prisoners to an emergency room for treatment to avoid the cost of hospitalization, was a moving force behind the decision not to immediately treat Plaintiff for Shingles, not to immediately send Plaintiff to the emergency room and/or hospital for treatment, to cancel medications prescribed to Plaintiff by the physician staff at the Ingham Medical Center, to deny Plaintiff's access to the

- 36 -

records provided to him by the staff at the Ingham Medical Center, to confine Plaintiff in solitary confinement without notice and opportunity to be heard in retaliation for expressing an intent to file grievances challenging the decision to delay or deny Plaintiff medical treatment, and the failure to provide Plaintiff with eye medication that was prescribed to Plaintiff.

156. As a direct and proximate result of the Defendants' policies, rules, regulations, customs, or practices, Plaintiff suffered from chunks of skin pealing off of his face that did not heal properly, the injuries took a prolong period to heal in the improper manner in which it did, Plaintiff suffers from permanent scarring and skin discoloration in the area on Plaintiff's skin where the Shingles virus was located, Plaintiff suffers from permanent impairment to his vision, including, but not limited too, photophobia and the inability to see clearly and properly, continued pain and/or nerve damage and numbness to the right side of Plaintiff's head, face, temple area, and right eye, and an increased risk of once again contracting the Shingles virus.

COUNT VI

DENIAL OF REASONABLE ACCESS TO THE COURTS

MICHIGAN'S MEDICAL MALPRACTICE STATUTE

157. In accordance with Article V § 1 of the Michigan Constitution, the governor for the State of Michigan signed into law or enacted Michigan's Medical Malpractice statute.

158. As the current Governor for the State of Michigan, Defendant Snyder, exercising his executive power pursuant to the Michigan Constitution, is responsible for ensuring and have ensured compliance with Michigan's Medical Malpractice statute.

159. Among other things, Michigan's Medical Malpractice statute provides

- 37 -

that in order to pursue a medical malpractice claim in Michigan, a plaintiff is required to file an affidavit of merit with a complaint alleging medical malpractice. MCL 600.2912d(1).

160. The affidavit of merit is mandatory because the statute directs that a plaintiff, or his/her attorney, "shall file with the complaint an affidavit of merit ..." Id. (emphasis added).

161. The affidavit of merit must contain medical expert testimony against the person whom is being sued for medical malpractice, and the affidavit must set forth all of the following standards: (a) the standard of medical care that is universally accepted for a person to receive in connection with the medical claims under review; (b) an opinion from the medical expert that the standard of care was breached by the health care professional being sued; (c) the appropriate actions that the health care professional should have taken to comply with the standard of care; and (d) the manner in which the breach proximately caused the alleged injury.

162. Michigan's medical malpractice statute, including but not limited too the requirement for the filing of an affidavit of merit, applies to all citizens in the state, including those citizens inside Michigan's penal institutions or state correctional facilities.

163. Defendant Snyder has not enacted any law or statute in the State of Michigan which allows for the appointment of a medical expert, or for the waiver for the filing of an affidavit of merit, for those Michigan citizens in society or those inside Michigan's state correctional facilities whom are financially unable to hire a medical expert to file an affidavit of merit so as to enable these indigent persons to pursue legitimate and meritorious medical malpractice claims in Michigan's state courts.

164. Plaintiff is a prisoner under the jurisdiction of the MDOC and has suffered malpractice at the hands of Defendants Corizon, its president, CEO,

shareholders, and/or owners, as well as medical personnel employed by the said Defendants at RMI's HSU.

165. However, Plaintiff is unable to pursue his claims of medical malpractice in Michigan's courts against said Defendants because Plaintiff is indigent and cannot afford the expense of hiring a medical expert to file an affidavit of merit in accordance with or pursuant to Michigan's medical malpractice statute enforced by Defendant Snyder.

166. As a direct and proximate result of not being able to hire a medical expert in order to file the affidavit of merit that is required by Michigan's medical malpractice statute, Plaintiff does not have access to any court in the State of Michigan in order to pursue his claims of medical malpractice against the said Defendants, and the said Defendants are taking advantage of this by not providing Plaintiff with adequate medical care.

<u>COUNT VII</u>

<u>DUE PROCESS AND FIRST AMENDMENT VIOLATIONS</u>

167. In late September or during the first week of October of 2015, Plaintiff's mother mailed him copies of log book entries recorded in housing units at the Michigan Reformatory. She received the material through a freedom of information act request filed with the MDOC.

168. The sections of the log books copied contained entries pertaining to Plaintiff written by corrections officers during those times that Plaintiff was infected with the Shingels virus and their attempt to aid Plaintiff.

169. On or about the first week of October, Defendant Christiansen intercepted the material and, rather than forwarded it to Plaintiff, instead forwarded and discussed the material with Defendant Simmons, questioning whether the material should be delivered to Plaintiff.

170. Plaintiff has a constitutional right to receive uncensored mail while incarcerated, unless the censoring of mail serves a legitimate penological interest or justification.

171. Defendant Simmons ordered Defendant Christiansen to reject and refuse to deliver the material to Plaintiff on the pretext that the material was a "threat to the safety and security of the institution". No explanation was given by Defendants Simmons and Christiansen as to why the material posed this purported threat, other than indicating that the material was a threat because it was sent to Plaintiff by Plaintiff's mother rather than by an attorney or a court.

172. There was no legitimate penological justification in Defendants Simmons and Christiansen censoring and refusing to deliver the material mailed to Plaintiff by his mother.

173. On October 8, 2015, Plaintiff objected to the refusal of the said Defendants to deliver the material, and so requested that an administrative hearing be conducted on the material to determine its admissibility into the facility.

174. On or about October 19, 2015, Defendant Frias conducted an administrative hearing on the material. As a simple prison counselor, Defendant Frias is a subordinate to Defendant Simmons, who is one of the facility's inspectors.

175. Therefore, at the start of the administrative hearing Plaintiff objected to Defendant Frias conducting the hearing because he was a subordinate to Defendant Simmons. Plaintiff argued to Defendant Frias that he should not be permitted to hold the hearing because he was not going to be fair and impartial in light of the fact that his superior or commanding officer, Defendant Simmons, ordered him not to deliver or give the material to

- 40 -

Plaintiff.

176.   Defendant Fries ignored Plaintiff's argument, and conducted the hearing anyway.   He then ordered that the material not be delivered to Plaintiff on the pretext that it was a threat to the security of the facility, based upon what Defendant Simmons ordered; and, hence, in reality Defendant Fries refused to deliver the material to Plaintiff because he did not have a choice in the matter given the order by Defendant Simmons not to deliver or give the material to Plaintiff.

177.   Plaintiff appealed the decision made by Defendant Fries, and on or about November 13, 2015, prison counselor David Reed addressed the appeal with Plaintiff.   Reed, who is also a subordinate to Defendant Simmons, upheld the decision of Defendant Fries on the pretext that the material contained information about other prisoners and unit functions and that the material was exempt to prisoners, although he cited no authority in support of his position.

178.   However, the real reason that Counselor Reed did not overturn the decision of Defendant Fries is because his superior or commanding officer, Defendant Simmons, had ordered that the material not be delivered to Plaintiff.

179.   Thereafter, Defendant Christiansen destroyed the material rather than allow Plaintiff to return the material to his mother.

180.   As a direct and proximate result of the Defendants' aforementioned actions, Plaintiff was improperly deprived of the written material.

## S T A T E M E N T   O F   C L A I M S

### FIRST CAUSE OF ACTION
### (CRUEL AND/OR UNUSUAL PUNISHMENT)

181.   Plaintiff incorporates by reference paragraphs 19-78 and 140-156 above as if set forth fully herein.

182.   In order to maximize cost savings at the expense of Plaintiff's

- 41 -

health and safety, the Defendants were deliberately and intentionally indifferent to Plaintiff's serious medical needs when they failed, and/or caused the failure of others to, examine, test, and/or identify the condition that Plaintiff was suffering from, and were intentionally and deliberately indifferent to Plaintiff's serious medical needs when they failed, and/or caused the failure, to allow Plaintiff access to medical treatment, including, but not limited too, treatment at RMI and at an emergency room and/or hospital, in a reasonable and timely manner in order to treat the very serious medical condition that Plaintiff was suffering from, in direct violation of Art. 1, § 16, of the Michigan Constitution and the 8th Amendment to the United States Constitution, as incorporated by the 14th Amendment and enforceable through 42 USC § 1983.

183.   The Defendants' actions to maximize cost savings at the expense of Plaintiff's health and safety by failing to purchase and/or make available at RMI the means to test prisoners in order to quickly determine whether such prisoners have Shingles, or any other means to quickly identify such condition, and/or the practice of medical staff feigning ignorance of Plaintiff's condition so that they would not have to spend the money in order to treat it, in addition to the initial failure and/or refusal to permit Plaintiff access to medical supplies in order to treat his condition, including access to an emergency room and/or hospital in order to receive treatment, resulted in said Defendants being deliberately and intentionally indifferent to Plaintiff's serious medical needs.

## SECOND CAUSE OF ACTION
### (DUE PROCESS VIOLATIONS)

184.   Plaintiff incorporates by reference paragraphs 82-84, 89-90, 106, and 140-156 above as if set forth fully herein.

- 42 -

185.  The Defendants' confiscation, or the implementation of the policies, rules, regulations, customs, and practices that caused the confiscation, of Plaintiff's discharge medical instructions and other medical documentation without notice and a right to be heard, and then causing Plaintiff to pay for the documents, with the specific intent to make money, violated the Due Process Clause of Art 1, § 17, of the Michigan Constitution and the 14th Amendment to the United States Constitution, as enforceable through 42 USC § 1983.

### THIRD CAUSE OF ACTION

### DUE PROCESS VIOLATION AND
### CRUEL AND/OR UNUSUAL PUNISHMENT

186.  Plaintiff incorporates by reference paragraphs 84-85, 102-105, 113, 123, and 140-156 above as if set forth fully herein.

187.  The Defendants' cancellation, confiscation, and their decision to deny Plaintiff access to prescription medications, and/or their policies, rules, regulations, customs, or practices which caused the confiscation, cancellation, and the decision to deny Plaintiff access to prescription medications, in order to maximize cost savings at the expense of Plaintiff's health and safety, violated Art. 1 §§ 16 and 17 of the Michigan Constitution and the 8th and 14th Amendments to the United States Constitution as enforceable through 42 USC § 1983.

188.  The Defendants' confiscation and cancellation, without notice and an opportunity to be heard, of the prescription medication that was ordered for Plaintiff's health and safety by the physician staff at the Ingham Medical Center, coupled with the decision to deny Plaintiff's access to the medication prescribed for his eyes, and/or their failure to ensure that Plaintiff received the eye medication that was later prescribed, clearly violated due process and subjected Plaintiff to cruel and/or unusual punishment.

- 43 -

## FOURTH CAUSE OF ACTION

### DUE PROCESS VIOLATION AND
### CRUEL AND/OR UNUSUAL PUNISHMENT

189.   Plaintiff incorporates by reference paragraphs 86-88, 91-101, 107-122, 124, and 140-156 above as if fully set forth herein.

190.   The Defendants' order or decision, and/or the polices, rules, regulations, customs, or practices that caused the issuance of the order or decision, to confine Plaintiff in solitary confinement on a purported quarantine stauts upon Plaintiff's return from the hospital, in addition to the order or decision, and/or the polices, rules, regulations, customs, or practices that caused the issuance of the order or decision, to confine Plaintiff in solitary confinement on the pretext of a medical quarantine, but was actually done to retaliate against Plaintiff, without notice and an opportunity to be heard, violated Art. 1 §§ 16 and 17 of the Michigan Constitution and the 8th and 14th Amendments to the United States Constitution, as enforceable through 42 USC § 1983, especially given the fact that Plaintiff was confined or supposedly quarantined in a cell located in the dark corner of the solitary confinement unit that had no windows, ventilation, or sunlight, and was infested with mice, coupled with the fact that Plaintiff was not permitted to have any personal property while so confined.

## FIFTH CAUSE OF ACTION

### DUE PROCESS VIOLATION AND
### CRUEL AND/OR UNUSUAL PUNISHMENT

191.   Plaintiff incorporates by reference paragraphs 86-88, 91-101, 107-122, 124, and 140-156 above as if fully set forth herein.

192.   The Defendants' failure to properly promulgate policies, rules, or regulations and to train or instruct staff, so as to properly guide their

discretion, on how to handle or impose medical quarantines on prisoners in cases such as Plaintiff's, where a prisoner has not declined or refused required medical screening, testing, or treatment for communicable diseases and of whom is suspected or may have a communicable disease or infected with some type of other virus, as well as the lack of polices, rules, or regulations, and the lack of training or instructing staff, on the manner in which prisoners are to be placed on a medical quarantine in a solitary confinement unit, including, but not limited too, the type of property that such prisoners are permitted to have while on such status, resulted in Plaintiff being confined in solitary confinement on a medical quarantine status in retaliation to the decision to challenge the confiscation and cancellation of prescribed medications, quarantined without being given a reason and an opportunity for a hearing, and quarantined in a dark corner of a unit that had no windows, ventilation, or sunlight, as well as infested with mice, in addition to being confined without any personal property in the same manner that prisoners serving punitive sanctions were confined in such solitary confinement unit, and this violated Art. 1 §§ 16 and 17 of the Michigan Constitution and the 8th and 14th Amendments to the United States Constitution, as enforceable through 42 USC § 1983.

## SIXTH CAUSE OF ACTION
### (CRUEL AND/OR UNUSUAL PUNISHMENT)

193. Plaintiff incorporates by reference paragraphs 125-139 and 140-156 above as if fully set forth herein.

194. The Defendants' decision, and/or the implementation of the policies, rules, regulations, customs, or practices that led to the decision, based on the need to maximize cost savings at the expense of Plaintiff's health and safety, to deprive Plaintiff of, and/or delay Plaintiff's access to, eye

medication after an examination demonstrated that Plaintiff's vision was threatened and that he was in need of medication to treat the condition, subjected Plaintiff to cruel and/or unusual punishment in violation of Art. 1 § 16 of the Michigan Constitution and the 8th Amendment to the United States Constitution as incorporated by the 14th Amendment and enforceable through 42 USC § 1983.

## SEVENTH CAUSE OF ACTION
### (DENIAL OF REASONABLE ACCESS TO COURTS)

195.  Plaintiff incorporates by reference paragraphs 157-166 above as if fully set forth herein.

196.  Michigan's statutory scheme, which denies Plaintiff a reasonable and meaningful opportunity to litigate medical malpractice claims in Michigan's courts unless a medical expert is retained or obtained to file an affidavit of merit, results in Plaintiff not being able to file medical malpractice claims because Plaintiff cannot afford the costs to retain or obtain a medical expert, and therefore Plaintiff does not have reasonable and meaningful access to Michigan's courts in violation of the First Amendment to the United States Constitution as incorporated by the 14th Amendment and enforceable through 42 USC § 1983.

197.  MCL 600.2912d, which requires the filing of an affidavit of merit, is unconstitutional as applied to Plaintiff, because it prevents Plaintiff from having reasonable and meaningful access to Michigan's courts to pursue claims of medical malpractice.

## EIGHTH CAUSE OF ACTION

### DUE PROCESS AND
### FREEDOM OF SPEECH VIOLAITONS

198.  Plaintiff incorporates by reference paragraphs 167-180 above as if

- 46 -

fully set forth herein.

199.  The Defendants' confiscation and destruction of log entries mailed to Plaintiff by his mother without a legitimate penological interest violated the First Amendment to the United States Constitution, as incorporated by the 14th Amendment and enforceable through 42 USC § 1183.


### NINETH CAUSE OF ACTION
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

200.  Plaintiff incorporates by references paragraphs 19-78, 84-85, 102-105, 113, 123, 125-139, and 140-156 above as if fully set forth herein.

201.  The Defendants' infliction of punishment upon Plaintiff that was cruel and/or unusual, as well as their actions of depriving Plaintiff of access to medications, as previously described herein, caused Plaintiff unnecessary and painful suffering and intentionally inflicted upon Plaintiff emotional distress in direct violation of Michigan state or common laws.


### TENTH CAUSE OF ACTION
### (ABUSE OF PROCESS & FALSE IMPRISONMENT)

202.  Plaintiff incorporates by reference paragraphs 86-88, 91-101, 107-122, 124, and 140-156 as if fully set forth herein.

203.  The Defendants' misuse of the procedure to confine, or causing the confinement of, Plaintiff in solitary confinement as previously described herein, without notice and an opportunity to be heard, coupled with their lack of authority to confine, or cause Plaintiff's confinement, in solitary, resulted in the abuse of that process and falsely imprisoned Plaintiff in direct violation of Michigan's state laws.

## ELEVENTH CAUSE OF ACTION
### (ABUSE OF PROCESS)

204.   Plaintiff incorporates by reference paragraphs 167-180 as if fully set forth herein.

205.   The Defendants' misuse of the procedure to confiscate Plaintiff's mail, followed by the destruction of that mail, as previously described, resulted in the abuse of that process in direct violation of Michigan's state laws.

### RELIEF REQUESTED

206.   WHEREFORE,  for  the  foregoing  reasons,  Plaintiff  respectfully requests  and  prays  that  this  Honorable  Court  grant  Plaintiff  the  following relief:

1.   Award  Plaintiff  $1500  for  each  day  that  Plaintiff  was  confined  in solitary confinement;

2.   Award  Plaintiff  damages  in  excess  of  $10,000;

3.   That  the  Court  issue  an  order  requiring  the  Defendants  to  furnish Plaintiff  in  the  future  with  copies  at  no  cost  of  any  "discharge  documents" that  hospital  or  medical  professionals  provide  for  Plaintiff  after  being discharged  from  a  hospital,  and  that  these  documents  be  provided  to  Plaintiff within  24  hours  following  discharge  from  a  hospital  and  returned  to  a correctional facility;

4.   That  this  Court  strike  down  the  Defendants'  practice  of  confiscating mail  that  does  not  violate  a  legitimate  penological  interest,  and  reimburse Plaintiff  for  the  cost  to  purchase  the  medical  discharge  information  as previously described;

5.   That  this  Court  enter  an  order  of  injunctive  relief  requiring  that  the following be performed by the Defendants:

> (a)   that  the  Defendants  be  required  to  furnish  Plaintiff  with  the necessary  money  to  enable  Plaintiff  to  seek  and  receive reconstructive  and  corrective  eye  surgery  to  repair  his  vision  and  to rid  Plaintiff's  face  of  the  deep  tissue  scarring  and  discoloration that resulted from this incident;
>
> (b)   That  the  Defendants  fill  any  and  all  prescription  and/or  other medication  that  were  ordered  by  the  physician  staff  at  the  Ingham Medical  Center  for  Plaintiff's  care  intended  to  immunize  or  vaccinate Plaintiff  from  the  Shingles  virus  and  of  which  will  aid  in  the complete suppression or dormancy of the Shingles virus;
>
> (c)   that  the  Defendants  be  prohibited  from  confining  Plaintiff  to solitary  confinement  for  a  medical  quarantine  purpose  if  Plaintiff does  not  have  an  "airborne"  communicable  disease  that  is  contagious

- 49 -